In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00191-CR**
_____

**ERICH STOCKLEY SEALS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 13-16894**

**MEMORANDUM OPINION**

A jury convicted Appellant Erich Stockley Seals (Appellant or Seals) of aggravated assault with a deadly weapon, a second degree felony. *See* Tex. Penal Code Ann. § 22.02(a)(1) (West 2011). After a bench trial on punishment, the trial court sentenced him to twenty-five years of confinement. Appellant raises seven issues on appeal. We affirm the trial court's judgment.

1

FACTUAL BACKGROUND

On May 23, 2013, the State indicted Seals for aggravated assault for shooting Donald Williams, Jr. (Williams) on April 30, 2013. The indictment also alleged that Seals had previously been convicted for possession of a controlled substance in 1994. Prior to trial, and outside the presence of the jury, Seals filed a motion in limine to exclude evidence regarding allegations of events that occurred after the April 2013 shooting. The State responded that it anticipated any such evidence would bear on Seals's claim of self-defense. The court declined to rule on the motion, but it admonished the parties to approach the bench before eliciting any testimony regarding such matters.

Testimony of Donald Williams, Jr.

Williams testified at trial that Seals shot him in the chest on April 30, 2013. Williams explained that his wife has a child from a previous relationship with Seals. According to Williams, a few months before the shooting, Williams overheard a phone conversation between his wife and Seals in which Seals yelled at Williams's wife, used foul language, and called her ugly names. Seals also told Williams "I will kill you." Williams testified that "I just told him, I said, [w]ell, if you want to fight about it, we will fight about it. And then that's when I said, [w]ell, I'm not going to tongue wrestle with you over the phone. When I see you

2

we will take care of it." Williams agreed he challenged Seals to a fist fight. According to Williams, he had never talked to Seals prior to this phone call and had only seen Seals once at a pool hall, but the two men did not speak on that occasion, and Williams did not see Seals again until the day of the shooting.

Williams explained that, on the day of the shooting, he was talking with his sister on the sidewalk near the front entrance gate at the Port Arthur Park Apartments complex, where his sister lived. According to Williams, while they were talking, a car pulled in, he recognized the driver as Seals, and he and Seals made eye contact. A few minutes later, Williams left with David Rogers (Rogers), and as they were about to leave the apartment complex, they saw Seals sitting in a car at the exit gate, and Williams pulled his car up about ten or fifteen feet behind Seals's vehicle. Williams did not know why Seals was waiting at the gate. Williams got out of his car, walked up to Seals's car, and Williams expected there would be a fight.

Williams testified that Seals had his car window partially down. Williams threw his hands up "ready to fight[]" and said to Seals "Hey, what's up?" According to Williams, Williams had nothing in his hands, does not carry a gun or a knife, and did not approach Seals with a weapon. Williams stepped back from Seals's car because he expected Seals to get out, when the next thing Williams

3

knew, he was shot in the chest, "an inch away from [his] heart." Rogers drove Williams to the hospital. Williams identified Seals as the person who shot him on April 30, 2013. Williams testified that he did not regret stepping up to fight Seals because he was "defending [his] wife" and because Seals had disrespected his wife. Williams testified that he never saw a gun during the incident until Seals pulled the trigger.

On cross-examination, Williams explained that during the phone call that occurred prior to the shooting, Seals said "I will kill you." The defense asked Williams whether he planned on fighting Seals the next time he saw Seals after the phone call, and Williams responded:

> Well, he said he was going to kill me, so what do you think? You think I'm going to get killed first? I didn't want to kill him. I wanted to fight him. I never had intentions on killing him. I never said I was going to kill him. I wanted to fight.

Testimony of David Rogers

Rogers testified that he was with Williams at the Port Arthur Park Apartments complex on April 30, 2013. Rogers stayed in the car, and noticed Seals pull into the complex. Rogers knew "there was some tension" between Williams and Seals, and Rogers thought that Williams and Seals did not like each other.

Rogers noticed Seals's car again at the exit gate when Rogers and Williams were leaving the complex. Rogers testified that Williams got out of their car, and

4

Rogers thought Williams was "upset[]" and that Williams and Seals were going to get into a verbal argument that might develop into a fist fight. According to Rogers, Williams did not have any kind of weapon, but Williams had his hands up "like he was trying to invite [Seals] to come out of the vehicle[,]" and Williams and Seals argued for three to five minutes before Williams was shot.

According to Rogers, Williams approached the driver's side of Seals's car and the window on the driver's side of Seals's car "was almost all the way up except for maybe like a couple of inches of gap in the window." Rogers agreed that Seals could have left the situation without speaking to Williams, and Rogers agreed that during the argument, the exit gate was open and Seals could have driven away.

Rogers was also present at Williams's home during a telephone call that occurred prior to the shooting and during that call Seals was disrespectful to Williams's wife. Rogers overheard Seals tell Williams "I am going to kill you[,]" and Rogers was not surprised that Seals shot Williams.

Testimony of Investigator Croak

Investigator Croak (Croak) of the Port Arthur Police Department testified that he got a call on April 30, 2013, concerning a shooting victim who was at the hospital. About the same time as the call, Seals appeared at the police station

5

stating he had been involved in a shooting. Croak personally met with Seals at that time and Seals told Croak the weapon used in the shooting was in Seals's car. After getting consent from Seals, Croak went to Seals's vehicle and the weapon was "in plain view[]" on the front seat. Croak took the weapon into custody and logged it into evidence. Seals gave consent to Croak and then Seals's wife or a relative showed Croak the location of the gun.

Croak also obtained a statement from Rogers, and it was Rogers who indicated that Seals and Williams had an "exchange of words in the past." Rogers told Croak that Williams had approached Seals's vehicle and "lunged toward the door[,]" and that there was an argument and a gunshot.

Testimony of Marcelo Molfino

Marcelo Molfino (Molfino), assistant chief investigator for the district attorney's office, also testified at trial. Molfino was working as an officer for the Port Arthur Police Department at the time in question and he received a call about a gunshot victim who was at the hospital. While Molfino was on the way to the hospital, he received another report that the "possible suspect in the shooting" was at the police station. Molfino returned to the police station and met with the individual, who was identified as Seals, and Molfino then read Seals his *Miranda* rights and took a statement, which Seals signed. The State offered Seals's

6

statement into evidence, and defense counsel objected on the basis of hearsay and the Fifth Amendment. The court overruled the objections and admitted the statement. The portion of the statement that includes Seals's description of events was read into the record by Molfino, in relevant part as follows:[1]

> I went to the Jefferson Apartments to drop off a guy I know as Swan and his wife. They needed a ride, so I gave them a ride. . . . I picked them up and took them to the Jefferson Apartments. They live in the back. . . . I dropped them off and I come [sic] into the gate. I don't have time for beef. This guy, [P]eanut, is married to my baby mama. Peanut was with some guys when I came in the gate. I saw [P]eanut standing there. Peanut was in [a] black looking car, maybe a Nissan. When I am trying to leave, he is swerving behind me. Peanut pulls up on my right behind me in his car. Peanut had one other guy in the passenger side of his car. Peanut gets out of the car and tells me, come on now. Come on now. So he is standing by my driver window. He starts acting like he is going to hit me and comes at my window and he was about to strike me. Peanut did not have anything in his hands. I had my little cousin's gun with me on the side of my seat. It's a . . . black small semi-automatic pistol. As [P]eanut comes to hit me, I shot one time at [P]eanut to get him off me. When I shot [P]eanut he ran back to his car and they drove off. I didn't call the police, but I went straight to get my [fiancé] at home. . . . I went and told [my fiancé] what happened and told her I wanted to go talk to the police. From [my fiancé]'s house I went to my mom's house. . . but my mom wasn't there. From there I came straight to the Police Department to give my statement to the police of what had happened. I left the gun in the car and gave the police permission to take the gun out of my car. . . .

---

[1] At trial, Seals testified that he knew the Port Arthur Park Apartments by the name "Jefferson."

7

Seals told Molfino that Seals's car window did not work properly, and Seals and Molfino went to the car, where Seals re-enacted "his version of how things happened[,]" because Molfino wanted to see if Seals had "shot out of his window in actuality where the window was, where he stated he was, [and] if there was a threat . . . ." Molfino made a video recording of Seals's demonstration. The video recording was offered into evidence. Defense counsel objected to the video on the basis that the video constituted a videotaped confession and did not include Seals's *Miranda* rights. According to Molfino, he usually reads *Miranda* rights on the video when he conducts a videotaped interview, but in this case, Seals "drove himself to the station. He was not in custody. . . . he was the one to tell us his facts. He was free to leave at any time." The court overruled the defense objections and allowed the video recording to be admitted into evidence stating on the record that the recording was not the result of a custodial interrogation, and in fact, Seals had been Mirandized, even though it was not required.

Molfino explained that he tried to get Seals to describe what happened. The most important part to Molfino was trying to figure out whether Seals was the aggressor or acted in self-defense. Seals told Molfino that Williams did not have a weapon in his hands. It was important to Molfino to determine how far the car window was open because, if the window was fully open, then someone could

8

come into the car, but if the window was only partly open, then Seals would have had to reach out of the opening in the driver's side window:

> . . . He had to physically stick his hand out and almost look for him because there is no way he could have shot that gun and the glass not break if he is shooting in the direction he is. So for the victim to be shot the way he was Mr. Seals had to take -- physically take his hand out the window and shoot him.

> . . . .

> . . . [I]f you take his statement, that trajectory of what he is saying he shot, the way his window was, the victim's injuries, it was my opinion that he was the aggressor. There is no way that he could have shot him the way that he was and the way the victim was shot and he had to have looked for him and shot him and then drove off.

The reenactment video was played for the jury and shows an opening in the driver's side car window. Molfino testified that Seals told Molfino, both on the video and in his statement, that the gate was open and he could have driven away at any point during the confrontation. Molfino also explained that there was no indication that Seals called for an ambulance or that he called 911 after the shooting. According to Molfino, Seals drove to his fiancé's and mother's homes before driving to the police station. And, Seals did not express any regret or remorse while giving his statement to Molfino.

On cross-examination, Molfino agreed that the date on Seals's statement was incorrect and explained that he had used a "shell" document and failed to change

9

the date thereon. Molfino also agreed that when Seals came into the police station to tell his side of the events, Seals waived his *Miranda* rights, and Seals did not have to do so. Molfino explained that Seals told him Williams was agitated and speaking with his hands, but there was no weapon in Williams's hands. Molfino referenced his report where it noted that Seals stated Williams was "not armed or reaching for a weapon or object." Molfino testified that, in his opinion, "Mr. Seals was being untruthful and had to be the aggressor because, again, he had to reach out the window, turn, acquire a target and shoot." Molfino further explained that he remembered Seals saying that the gate was open, and that Seals had "ample opportunity to exit [the] situation[.]" Molfino testified that:

> In this case, Mr. Seals had ample opportunity to explain to us that it was self-defense. The more we spoke with him, the more we investigated the scene, the more we looked at the victim's injuries, it was clear to me that this was not self-defense and that Mr. Seals was the aggressor.

In Molfino's opinion, there was no indication that Williams had used or attempted to use deadly force against Seals and Seals never told Molfino that Seals had been in fear for his life. In Molfino's opinion, if Williams had swung at Seals or even hit Seals, such conduct would not constitute deadly force.

10

Testimony of Kenneth Swan

After the State rested its case in chief, Seals called Kenneth Swan (Swan) as his first witness. Swan operates a business next to Seals's shop and Swan had known Seals for about a year. On the day of the incident, Swan and his wife were walking home and Seals picked them up and took them to the Port Arthur Park Apartments, where the Swans lived. After the Swans got out of the car, Swan noticed a black Nissan drive by them. Swan denied knowing the victim in this case and denied knowing of any issues Seals may have had with the victim. Swan did not see a gun in Seals's car that day and Seals did not tell Swan that Seals had a gun that day.

Testimony of Officer Walker

Next, the defendant called Officer Walker of the Port Arthur Police Department as a witness. Walker testified that he knew Seals personally. Walker agreed he was "familiar with" Donald Williams and that he knew that Seals was afraid of Williams. Walker had heard of Seals's criminal history but he was unaware of Seals having been convicted of assault or of multiple felony drug convictions.

Testimony of Deedra Gaskill

Deedra Gaskill (Gaskill) also testified for the defense. Gaskill is Seals's fiancé and they have been in a relationship for about fourteen years. Prior to the shooting, Gaskill knew who Williams was, although she did not know him personally. Gaskill explained that she and Seals had conversations about Williams "harassing" and "bothering" Seals. On April 30, 2013, Seals arrived at her home "nervous and shaking and crying[]" saying he had just shot someone and that "[he] didn't want to do it." Seals wanted to turn himself in, and Gaskill followed him first to his mother's house and then to the police station.

Testimony of Erich Seals

Seals also testified at trial. Seals explained that Williams is married to a woman with whom Seals had a child and that Seals and Williams had issues prior to the shooting. Seals did not know how old his son was, and he agreed he owed the mother money for child support. Seals did not recall having a phone conversation with Williams before April 30, 2013.

Seals's first incident with Williams was at a pool hall, where Williams yelled at him and asked him to go outside, and Seals had then feared for his safety. Seals then saw Williams again a few days later at a gas station where Williams was "in [his] face" and other people broke them up. Seals had heard that Williams

12

carried a weapon. Seals normally carries a gun with him because he makes "cash money," is in "business," and "to protect himself."

On April 30, 2013, Seals offered the Swans a ride home to the Port Arthur Park Apartments, and as he entered the complex, he saw Williams but he did not stop to say anything. After dropping off the Swans, Seals drove to the back gate of the complex to exit because he did not want to go back where Williams was and he did not want any trouble. Seals knew that sometimes the exit gate in the back did not work properly.

According to Seals, when he drove up to the gate, it was not open and he saw a black car "pretty close[,]" less than a car's length behind him. Seals could not back up because the black car was too close and he was "trapped." Williams "jumped out of the car[]" and approached Seals's vehicle and was next to Seals's car window.

Williams raised his arms and was punching at Seals and Williams came towards Seals's vehicle. Seals did not know what Williams had in his hands or what Williams had in mind, and Seals testified that "I was fearing for my life and my safety at the same time." Seals fired his gun once "to get [Williams] off, get away from [Williams]." Seals fired the gun through his open car window. Seals

explained that after the shooting, he drove to his fiancé's house, then his mother's house, and then to the police station where he gave a statement.

Seals cooperated with the police, reenacted the incident, and gave a statement because it was the truth and he had nothing to hide. Seals told the police the gun was in his car and he did not tell the police they needed a search warrant for the gun. Seals did not tell Molfino that he feared for his life because Molfino did not ask him. Seals explained that he was not the aggressor in the situation and he was scared of Williams, and Seals thought his life was in danger.

During cross-examination, the State approached the bench and asked to question Seals concerning another incident that occurred on May 22, 2013 (May incident) involving Seals and Williams and the State offered certain video evidence of the May incident. The parties had previously discussed the May incident in a bench conference outside the presence of the jury, and it was part of the defendant's motion in limine. The defense objected to the video and the court overruled the objections. The trial court verbally instructed the jury regarding the May incident and the limited use of such information.

The State then cross-examined Seals regarding the May incident. Seals testified that on the day of the May incident, Seals went to a convenience store on his lunch break. Williams was at the store and he recognized Williams. Seals

14

agreed he could have walked out, but he grabbed a beer, put it on the counter, and stood in line a few feet behind Williams. According to Seals, Williams said something to him and the two men got into an argument or confrontation. Seals left the store and went to his car and got out a "stick bat" or "a little small bat." Seals testified that he and Williams verbally argued but "[n]obody touched anyone."

Seals recalled giving a statement to the police about the May incident. The State offered Seals's statement into evidence, and defense counsel objected on the basis of hearsay and Rule 403. The court overruled the objections and admitted the statement. The portion of the statement that includes Seals's description of the May incident reads in relevant part as follows:

> On or about 5/22/13 at approximately 1:28 p.m. I, Erich S. Seals, was at "CITGO" located at 1200 Gulfway Drive on my lunch break. I went to the store to purchase a plate lunch and two beers. I grab my beers went to the register to pay for them when I saw a m/b who I know by "Peanut[,"] later identified as Donald Williams. I knew this to be Williams because of confrontations I've had with him for the past year due to the fact that he's currently dating my son's mother. On April 30, 2013 I had an argument with Williams in Port Arthur Park Apartments which led me to shooting him. When I saw Williams he immediately confronted me and said, "I ain[']t dead, you didn't kill me". Williams and I got nose to nose and began arguing. After arguing with Williams, he paid for his items and walked outside towards black in color car. Once I saw this I began walking towards my truck which was parked at the one of the gas pumps. I went to my truck out [of] fear that Williams may have a weapon inside his vehicle due to the fact that I had just shot him less than a month ago. We continued to exchange words across the parking lot in a manner as if we were going to fight. During the course of exchanging words I went

15

> inside my truck and grabbed a small bat that I had located behind my
> seat. I held the bat in my hand and motioned like I was going to come
> in his direction, but I didn't. . . . .

After reading his statement, Seals explained that in the May incident, he felt the need to pull a weapon to protect himself "[b]ecause [Williams] went to his vehicle." Seals also explained that he did not leave the store because he "just was tired[]" and Seals "was fearing for [his] life[.]" Seals agreed that he had "[p]retty much" tried to avoid Williams, but when the May incident occurred, Seals felt tired of having to continually avoid Williams. According to Seals, Seals was not the aggressor in the May incident, but rather Williams was the aggressor, although Seals also agreed that he never saw Williams with a weapon.

Seals admitted that he had previously been convicted on a drug charge; but, he testified that he was a user and he had not been selling drugs. Seals also agreed that he had been convicted for an assault in 1991.

Other Testimony and Evidence Regarding the May Incident

The State called other witnesses to testify concerning the May incident. Williams testified that when he saw Seals at the convenience store that day, he ignored Seals as best he could, but that Seals spoke to him and acted agitated and aggressive and said "I should have killed [you]." Williams explained that he and Seals left the store at the same time, and after Seals got to his car, Seals "came

back across waving kind of a revolver, a long barrel pistol[]" and pointed the gun at Williams in the parking lot. Williams called 911 and he was certain Seals had a gun.

Rogers testified that he and his three-year-old son were with Williams at the convenience store at the time of the May incident. According to Rogers, Seals and Williams argued and Seals said to Williams "I should have killed you." Rogers recalled that Seals got what looked like an "older gun[]" from Seals's vehicle, that it had "a long barrel on the front of it[,]" and Seals then walked out and waved the weapon around, and Seals was threatening Williams. Rogers described the incident as "a one-sided event[,]" and he thought Seals was under the influence of drugs or alcohol at the time.

Molfino testified that he retrieved the surveillance video of the May incident from the store, and the video was then admitted into evidence as State's Exhibit 10, over the defendant's objection. Molfino described Seals's conduct in the video: "He's wanting to fight. He's begging him to fight just from watching it without even hearing the words and you can see the victim's hands are up, back, passive, you know, not wanting to fight." The video was played for the jury.[2]

---

[2] State's Exhibit 10 includes no audio.

17

The jury found Seals guilty. Seals elected to have the trial court assess punishment. Seals pleaded "not true" to the enhancement allegations pertaining to a prior conviction. The court assessed punishment at twenty-five years in the Texas Department of Corrections. Seals timely filed a notice of appeal.

INEFFECTIVE ASSISTANCE OF COUNSEL

In his first issue on appeal, Seals argues that he received ineffective assistance of counsel at trial because his counsel failed to investigate the circumstances and evidence surrounding the State's use of a subsequent extraneous offense. Specifically, Seals alleges that his trial counsel failed to obtain video evidence of the May incident and to view such evidence prior to trial with Seals. Seals argues that his trial counsel was aware of the May incident and that the video existed; and, but for his counsel's failure to investigate, the result of the proceeding would have been different.

To prevail on a claim of ineffective assistance of counsel, an appellant must prove two elements by a preponderance of the evidence: (1) trial counsel's performance was deficient; and (2) harm resulted from that deficiency sufficient to undermine confidence in the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *Ex parte LaHood*, 401 S.W.3d 45, 49-50 (Tex. Crim. App. 2013). An appellant's failure to make either of the required showings of

18

deficient performance or sufficient prejudice defeats a claim of ineffective assistance of counsel. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

An ineffective assistance of counsel claim "must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Ordinarily, the record on direct appeal is insufficient and does not adequately reflect trial counsel's failings, especially when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 592-93.

We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance; and, therefore, an appellant must overcome the presumption that the challenged action constituted "sound trial strategy." *Strickland*, 466 U.S. at 689; *Williams*, 301 S.W.3d at 687. When the record is silent, an appellate court may not speculate about why counsel acted as he did. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Without

19

testimony from trial counsel, the court must presume counsel had a plausible reason for his actions. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

At trial, during the State's cross-examination of Seals, the State approached the bench and argued that Seal's testimony had "opened the door to bringing in facts and testimony" pertaining to the May incident. Defense counsel responded that it had not received the video of this event, despite having asked about it, and had been told such video did not exist. The State referred to an email from an attorney for the State advising defense counsel of a video pertaining to two subsequent and separately-charged offenses and offering to make a copy of the video for the defense. The defense responded that the only video evidence it had received included only the reenactment and certain photographs.

The court adjourned briefly in order to view the video. Upon reconvening but still outside the presence of the jury, the court stated that

> . . . It looks like the fact that [defense counsel] did not have a copy of that file was not really anyone's fault and I think everyone has kind of agreed to that[.] . . . So what I am going to do is give [defense counsel] the afternoon to review that. Get a copy. Go over it and then we are going to be back in court, the attorneys and you, Mr. Seal[s], at 8 o'clock in the morning and then we will take up any objections with regard to that.

The parties agreed to this on the record.

20

The record in this matter includes a letter from the State to Seals's attorneys purporting to transmit two cds as to three offenses. The trial court concluded that no one was at fault for the defense counsel's not having received a video of the May incident prior to trial.

Appellant did not file a motion for new trial alleging ineffective assistance of counsel or otherwise develop a record of trial counsel's reasons for his actions. The record is silent as to counsel's trial strategy. *See Jensen v. State*, 66 S.W.3d 528, 542 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998) (for a claim of ineffective assistance of counsel, the record is best developed by an application for a writ of habeas corpus or a motion for new trial).

Because the record is silent regarding the strategy or decisions of trial counsel, we may not speculate as to trial counsel's strategy or conduct. *See Jackson*, 877 S.W.2d at 771. Furthermore, Seals has also failed to establish that but for counsel's alleged errors the result of the trial would have been different. *Strickland*, 466 U.S. at 694. We overrule issue one.

EVIDENCE OF SUBSEQUENT CONDUCT

In his second and third issues, Seals argues that the trial court abused its discretion in admitting evidence concerning the May incident. Seals's second issue

21

argues that such evidence was inadmissible under Texas Rule of Evidence 404 because the State merely offered it as "evidence of conforming character." According to Seals, at the time the evidence of the May incident was offered, "[t]he issue of aggressor was determined previously and proven through prior testimony and there was nothing to rebut." In his third issue, Seals argues the evidence was inadmissible under Rule 403 because the evidence of the May incident was not relevant, was not necessary for the State to prove the elements of its case, and the evidence caused the jurors to lose focus and set them up to make their decision on an improper basis.

The State contends that the evidence of the May incident was relevant to rebut Seals's defensive theory, "further establishes intent to threaten and harm Donald Williams[,]" and the similarities between the April shooting and the May incident are significant. The State argues that "[t]he offenses occurred only three weeks apart and demonstrated Appellant's continuing violent aggression toward the same victim[.]"

We review a trial court's decision to admit evidence and overrule objections for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's

ruling will be upheld." *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

The erroneous admission or exclusion of evidence is generally reviewed under the standard for nonconstitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Under Rule 44.2(b), even if the trial court erred in admitting the evidence, we may not overturn a criminal conviction for nonconstitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). In our determination of whether error adversely affected the jury's decision, we consider everything in the record, including testimony, physical evidence, jury instructions, the State's theories, any defensive theories, closing arguments, and voir dire. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014).

23

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b).[3] Rule 404(b) codifies the common law principle that a defendant should be tried only for the offense for which he is charged and not for other extraneous crimes. *Rogers v. State*, 853 S.W.2d 29, 32 n.3 (Tex. Crim. App. 1993); *see also Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting Tex. R. Evid. 404(b)) (emphasis omitted); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

The Court of Criminal Appeals has explained that "'Rule 404(b) is a rule of inclusion rather than exclusion.' The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz*, 279 S.W.3d at 343

---

[3] Effective April 1, 2015, the Texas Supreme Court and Texas Court of Criminal Appeals adopted amendments to the Texas Rules of Evidence. *See* 78 Tex. B.J. 42 (Tex. 2015). The amendments were part of a restyling project. *Id.* at 42. All citations to the rules of evidence in this opinion refer to the rules in effect at the time of Seals's trial.

24

(footnotes omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (discussing Fed. R. Evid. 404(b)).

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Texas courts utilize a two-step analysis for determining the admissibility of extraneous offenses or uncharged acts. *Rogers*, 853 S.W.2d at 32-33. Courts determine first whether the evidence is relevant to a material issue in the case and second whether the relevant evidence should be admitted as an exception to Rule 404(b). *Id.* The trial court's Rule 404(b) ruling admitting evidence is generally within the zone of reasonable disagreement "if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). When an accused raises a self-defense theory, the State may introduce extraneous offense evidence to refute a defensive theory raised by the defense. *See Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001); *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975); *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.); *Deleon v. State*, 126 S.W.3d 210, 216 & n.6 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Even if evidence is admissible under Rule 404(b), it may still be inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. *Casey*, 215 S.W.3d at 879; *see also* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Unfair prejudice does not mean simply that the evidence injures the opponent's case. *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999). "Rather[,] it refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)). The Rule 403 balancing factors include, but are not limited to, the following: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). The trial court is presumed to have engaged in the required balancing test under Rule 403 once a party objects on the ground of Rule 403 and the trial court rules on the objection,

26

unless the record indicates otherwise. *See Williams v. State*, 958 S.W.2d 186, 195-96 (Tex. Crim. App. 1997). The party opposing admission of the evidence bears the burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value. *See Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

At trial, Seals argued that, when he shot Williams, Seals feared for his life and acted in self-defense. In his own testimony, Seals testified that he had "issues" with Williams prior to the shooting and on one occasion he tried to avoid Williams when the two men ran into each other at a store. Seals testified that, on the day of the shooting, he decided to leave the apartment complex by a different exit to avoid Williams, and he did not want any trouble. He denied having ever told Williams he was going to shoot him or kill him and explained that, on prior occasions, he had attempted to avoid Williams.

During the State's cross-examination of Seals, the State approached the bench and argued that Seals's testimony had "opened the door to bringing in facts and testimony" pertaining to the May incident and that such evidence "clearly refutes and directly contradicts [Seals's] own testimony about avoiding confrontations" with Williams. The State also argued that testimony and video evidence of the May incident was relevant to show motive or similar scheme. The

27

defense responded that the evidence was inadmissible under Rule of Evidence 404(b) as character evidence offered to prove conformity therewith and Rule 403 as unduly prejudicial. The trial court overruled the objections and admitted the testimonial and video evidence of the May incident, explaining that the evidence was relevant to the defense theory of self-defense, to rebut a character trait that Seals addressed in his own testimony, and also to show common plan or scheme, motive, or intent. The court gave a limiting instruction to the jury prior to the display of the video to the jury, and the jury charge also included a limiting instruction concerning extraneous offense evidence.

Seals testified about the May incident and explained that he and Williams argued when they ran into one another at a convenience store. According to Seals, after Williams went to his vehicle, Seals retrieved a bat from his truck to protect himself. On cross-examination, the following exchange occurred:

[State's attorney]: Now, prior to the incident and when you had to defend yourself, had he been the aggressor towards you that entire time?

[Seals]: Yes, he have [sic].

[State's attorney]: Prior to the incident when you had to defend yourself, had you always tried to avoid him?

[Seals]: Pretty much I have.

28

[State's attorney]: Now, in regards to this second incident that occurred three weeks later, why didn't you do what you normally did by avoiding him?

[Seals]: Because I felt that we was going to start this same thing all over again. I would have to every time I see him I got to run. I got to keep moving around and I'm tired. It's a small town and pretty much we going to see each other in this town.

The video recording of the May incident shows a person identified as Seals approach another person identified as Williams and it appears that Seals is gesturing in an animated manner. Seals can be seen leaving the store and returning to his truck and then approaching Williams's car in the parking lot.

The trial court could have reasonably decided that the extraneous evidence at issue relating to the May incident had non-character conformity relevance because it was offered to rebut Seals's defensive theory that he had always tried to avoid confrontations with Williams, that Williams was the aggressor, and that Seals acted in self-defense. *See Powell*, 63 S.W.3d at 438. It is at least subject to reasonable disagreement whether the extraneous offense evidence made the defensive theory less probable. This evidence could reasonably be interpreted as showing that Seals was the aggressor toward Williams on another occasion. *Id.* (citing *Montgomery*, 810 S.W.2d at 387) (other crimes, wrongs, or acts evidence has non-character conformity relevance where it logically serves to make less probable defensive evidence that undermines an elemental fact). Furthermore, the trial court gave a

limiting instruction, and we presume that the jury followed this instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).[4]

The record before us does not affirmatively show that the trial court refused to conduct a Rule 403 balancing test. Rather, the trial court overruled the Rule 403 objection. We presume the trial court engaged in a balancing test before the court ruled on the objection. *See Williams v. State*, 958 S.W.2d 186, 195-96 (Tex. Crim. App. 1997). Furthermore, Rule 403 favors the admission of relevant evidence, and relevant evidence carries a presumption that it is more probative than prejudicial. *Id.* at 196. Seals has failed to overcome the presumption that the evidence was more probative than prejudicial. *See id.* at 195-96.

Finally, even assuming the trial court erred in overruling Seals's objections, we will not reverse the judgment if the error was harmless. *See* Tex. R. App. P. 44.2. In addition to hearing Seals's testimony that he shot Williams, the jury also heard Williams and Rogers testify that Seals was the aggressor in the shooting and that Seals could have left the scene by driving through the exit gate at the apartment complex instead of shooting Williams. The jury also heard Molfino's

---

[4] We have determined that the trial court could have reasonably concluded that the evidence of the May incident was relevant to rebut a defensive theory, and therefore we need not address any other theory under which the evidence may have been admissible. *See* Tex. R. App. P. 47.1. We address Seals's challenge to the trial court's limiting instruction later herein.

testimony regarding the fact that Seals could have exited, that Seals's window was broken and the space of the window would not have allowed Williams to strike Seals, that there was no evidence that Williams was armed, and that Seals had to point the gun out of the window, acquire his target, and shoot, which indicated to Molfino that Seals did not act in self-defense in shooting Williams but rather Seals was the aggressor. Therefore, we conclude any error in admitting evidence of the May incident did not affect a substantial right of Seals and any such error must be disregarded. *See* Tex. R. App. P. 44.2; *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). We overrule Seals's second and third issues on appeal.

## LIMITING INSTRUCTION

In his fourth issue, Seals argues that the trial court erred by giving an improper limiting instruction on the use of the extraneous evidence at the time the evidence was admitted and also in the jury charge. Seals argues that the limiting instruction given at the time the evidence was admitted was in error because it "stated nothing about the legal reasons the evidence should come in and amounted to nothing more than a comment on the weight of the evidence." As to the jury charge, Seals argues that it "never explains what the Defense Theory is." The State argues that Seals did not object to the limiting instructions at trial and thereby waived the issue on appeal.

31

When the State first began to question Seals concerning the May incident, the defense requested a limiting instruction, but did not specify the contents of the limiting instruction. The court then gave the following verbal instruction:

> All right, jury, the information that the district attorney is going into at this point has to do with another date where some matters occurred that you are going to hear about. This information is not for the purpose, necessarily, of showing that Mr. Seals acted in conformity with the -- or his character is in conformity with what they are about to talk about. This is to specifically rebut the evidence that the defense attorney through his client put on with regard to Mr. Seals being -- not being the aggressor and trying to avoid situations with Mr. Williams. You are only supposed to listen to it and take it for that purposes alone, not necessarily to show that at one point he acted the same way or in conformity there with.
>
> . . . .
>
> Just to try to make it clear, for legal purposes, I'm going to instruct you again a little more specifically that evidence of other wrongdoings or acts are not admissible to prove the character of a person in order to show that he acted in conformity with that. What you are going to hear and the purpose of it is solely to rebut the evidence that the defense has put on that Mr. Seals has been not the aggressor and also that he has generally tried to avoid being in areas or around Mr. Williams and you are supposed to take it for that purpose alone.

Defense counsel did not object to the content of the instruction. The jury charge also included the following instruction:

> The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of rebutting the defense theory. You may only consider it for that purpose. You cannot

32

consider the testimony for that purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if any, were committed.

The only objection defense counsel raised concerning the proposed written instruction was that it should read "You cannot consider the testimony for that purpose[]" rather than "You cannot consider the testimony for any purpose[]." The State did not object, and the court agreed to make the change requested. The final charge reflects the change as requested by the defense counsel.

Our first duty in analyzing an objection to the jury charge is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). Then, if we find error, we analyze that error for harm. *Id.* (citing *Middleton*, 125 S.W.3d at 453). Preservation of charge error does not become an issue until we assess harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.*

Limiting instructions are governed by Rule 105(a) of the Texas Rules of Evidence, which states:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal.

33

Tex. R. Evid. 105(a). A request for a limiting instruction must be made at the time of the admission of the evidence. *Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001). If the jury is required to consider evidence in a limited manner, then it must do so from the moment the evidence is admitted. *Id.* at 894.

Appellant cites to *Owens v. State*, 827 S.W.2d 911, 917 (Tex. Crim. App. 1992) in support of his argument that the jury charge must identify the defensive theory under which the court admitted evidence of the extraneous conduct. In *Owens*, the trial court admitted evidence of extraneous conduct and "[a]t the conclusion of the trial, the trial judge instructed the jury that it was only to consider the testimony of [the extraneous offense witness] for the limited purpose of 'determining the system of the Defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.'" 827 S.W.2d at 913. The court of appeals held that such evidence was properly admitted as an exception to Rule 404(b) "for the purpose of rebutting appellant's implicit defensive 'frame-up' theory." *Id.* at 914.[5] The Court of Criminal Appeals reversed the court of appeals and concluded that there was no basis for admitting the evidence as an exception to Rule 404(b). *Id.* at 917. The Court further explained that

---

[5] *See also Owens v. State*, 795 S.W.2d 822, 824-25 (Tex. App.—Texarkana 1990), *rev'd*, 827 S.W.2d 911 (Tex. Crim. App. 1992).

> . . . even assuming (1) a defensive theory of "frame-up" was actually raised at trial, and (2) evidence of appellant's "system" could have been offered to rebut that theory, this "frame-up" theory was not presented to the jury in the trial court's limiting instruction. Absent such additional instruction, there is no way for an appellate court to know whether the jury properly applied the evidence of appellant's "system" to rebut the weight or credibility of appellant's "frame-up" theory or relied on it for an improper basis such as character conformity.

*Id.*

We find *Owens* distinguishable. The defensive theory in *Owens* was an "implicit defensive 'frame-up' theory[]" that was alleged to have been "'implicitly raised'" during the trial. *Id.* at 914. In the case at bar, however, self-defense was an explicit affirmative defense raised throughout trial, including in Seals's own testimony, and for which a jury charge was given. The jury charge also included explicit instructions on self-defense, force, and deadly force. The court's limiting instruction stated specifically that "the defense has put on that Mr. Seals has been not the aggressor and also that he has generally tried to avoid being in areas or around Mr. Williams and you are supposed to take [the extraneous conduct evidence] for that purpose alone." On the record before us, we cannot say that the jury was not informed of the legal reason the extraneous conduct evidence was admitted or that the jury charge did not explain the defensive theory. Having found

35

that no charge error occurred, we need not perform a harm analysis. *See Ngo*, 175 S.W.3d at 744. We overrule issue four.

JURY CHARGE ON SELF-DEFENSE

In his fifth issue, Seals argues that the trial court erred in overruling his objections to the jury charge on the issue of self-defense and that the jurors should have been instructed to "place themselves into the shoes of the Defendant" in their determination of whether the use of deadly force was immediately necessary for self-defense. The State argues that the jury charge and instructions used the language of the statute and that a defendant is not entitled to non-statutory instructions on how to consider or evaluate specific types of evidence.

The trial court's charge must fully instruct the jury on the law applicable to the case and apply that law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004); *see* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). A jury charge that tracks the language of a particular statute is a proper charge. *Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996) (citing *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994)) ("Following the law as it is set out by the Texas Legislature will not be deemed error on the part of a trial judge."); *Duffy v. State*, 567 S.W.2d 197, 204 (Tex. Crim. App. 1978); *Benn v. State*, 110 S.W.3d 645, 648 (Tex. App.—Corpus Christi 2003, no pet.). Jury

36

instructions must be limited to setting forth the law applicable to the case and they may not express any opinion as to the weight of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 36.14; *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015).

"Non-statutory instructions, even when they are neutral and relate to statutory offenses or defenses, generally have no place in the charge." *Celis v. State*, 416 S.W.3d 419, 433 (Tex. Crim. App. 2013). "Normally, if the instruction is not derived from the code, it is not 'applicable law.'" *Walters v. State*, 247 S.W.3d 204, 214 (Tex. Crim. App. 2007). Consistent with the terms of Article 36.14, jurors should be permitted to "'freely read [undefined] statutory language to have any meaning which is acceptable in common parlance.'" *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012) (quoting *Denton v. State*, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995)); *see also Medford v. State*, 13 S.W.3d 769, 771-72 (Tex. Crim. App. 2000) (explaining that "terms not legislatively defined are typically to be understood as ordinary usage allows, and jurors may thus give them any meaning which is acceptable in common parlance"). Neither the defendant nor the State is entitled to a special jury instruction relating to a statutory offense or defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type

37

of evidence that may support an element of an offense or a defense. *Walters*, 247 S.W.3d at 212 (citing generally *Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998)). In such a case, the non-statutory instruction would constitute a prohibited comment on the weight of the evidence. *Id.*

Under Section 9.31 of the Texas Penal Code, a person may justifiably use force against another when he reasonably believes that the force is immediately necessary to protect himself from the other person's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31 (West 2011). Section 9.32 provides, in pertinent part, that a person is justified in using deadly force against another if he would be justified in using force under Section 9.31, and when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. *Id.* §§ 9.31, 9.32(a)(1), (a)(2)(A) (West 2011); *see also Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016).

In this case, the jury charge included the instructions and definitions relevant to self-defense, force, and deadly force. The jury charge offered by the defense included the instruction that "you should place yourself in the defendant's position and view the[] circumstances from that standpoint alone at the time in question." In addressing the defense's objection, the trial court noted that

. . . the first sentence says, A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary. So I believe that covers it. You can obviously explain that, but that line says specifically to them that it's the actor's belief of what's reasonably necessary.

The jury instructions define "force" and "deadly force" with respect to what the defendant reasonably believes. And as to "self-defense," the charge states "A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor[.]"

On the record before us, we conclude that the trial court did not err in overruling the objection and denying the defense's proposed jury charge. The jury charge used language as provided in the applicable statutory provision, and the additional language proposed by the defendant was non-statutory language to which Seals was not entitled. *See Celis*, 416 S.W.3d at 433; *Martinez*, 924 S.W.2d at 699; *Riddle*, 888 S.W.2d at 8; *Duffy*, 567 S.W.2d at 204; *see also* Tex. Code Crim. Proc. Ann. art. 36.14; *Gray*, 152 S.W.3d at 127. Having found that no charge error occurred, we need not perform a harm analysis. *See Ngo*, 175 S.W.3d at 744. We overrule issue five.

ADMISSION OF STATEMENTS BY DEFENDANT

In his sixth issue, Seals objects to the admission of his two written statements given to police and the reenactment video. Seals argues that the written

39

statements and the reenactment video are "hearsay without an exception" and are "testimonial," and the written statements and the reenactment video infringe on his right to remain silent and right against self-incrimination. Seals contends that the written statements were testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004), and the statements "amounted to a comment on Appellant's right to remain silent."

The State argues that the statements were admissible as an exception to the rule against hearsay as statements against interest. The State also argues that article 38.22 of Texas Code of Criminal Procedure does not apply because Seals was not in custody at the time the reenactment video was created. And, the State further argues that Appellant did not make a *Crawford* objection at trial.

a. Admission of the Evidence at Trial and Objections

First written statement. Investigator Molfino testified at trial that he took Seals's statement after advising him of his *Miranda* rights and that the written statement itself included *Miranda* warnings that were read to Seals and which were initialed by Seals. The defense objected to the admission of Seals's written statement arguing that it was hearsay, the document "was prepared in anticipation of litigation[,]" and that it violated the Fifth Amendment. The trial court overruled all objections and Molfino read the entire statement into the record.

Reenactment video. When the State offered Exhibit No. 3, the reenactment video, into evidence, the defense objected that "the Miranda rights had to be on the video for it to be admissible under Section 38.22." The State responded that Seals

> . . . had been Mirandized, he understood, he agreed to be videotaped while demonstrating what exactly happened. He signed the statement that he understood his rights. He waived those rights and agreed to speak to police officers. It's not a confession. It's a demonstration of how the events went down. So I don't feel that it falls under that provision for a videotaped confession.

Molfino then testified that Seals was "free to leave[,]" was not in custody, had been advised of his *Miranda* rights at the time the video was made, that it was only after the video was made that Seals was arrested, and that the recording was not custodial. The court overruled the defense objections, explaining:

> . . . I am going to overrule the objection and allow it in based on the fact that there was not a custodial interrogation. The defendant went himself in person and volunteered this information, in fact, had been Mirandized, probably even though he may not have needed to be at one point. And so I don't think that this video falls under Section 38.22 where he specifically says he is the result of a custodial interrogation.

Second written statement. The State offered State's Exhibit No. 9, Seals's written statement concerning the May incident, during cross-examination of Seals. Seals agreed that he chose to speak with a police detective and to give this statement. The defense objected that the statement was inadmissible as hearsay, was more prejudicial than probative under Texas Rule of Evidence 403, and was

"redundant and cumulative" of Seals's own testimony. The court overruled the objections and admitted the statement.

   b. Analysis

We first address Seals's objection on appeal that his written statement violated his Fifth Amendment right against self-incrimination. We employ a bifurcated standard of review when reviewing claims concerning *Miranda* violations and the admission of statements made as a result of a custodial interrogation. *Pecina v. State*, 361 S.W.3d 68, 78-79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We measure the propriety of the trial court's ruling under the totality of the circumstances, extending almost total deference to the trial court's rulings on questions of historical fact, as well as on its application of law to fact questions that turn upon credibility and demeanor. *Id.* at 79; *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011).

Under the Fifth Amendment, a defendant shall not "be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.; *Dansby v. State*, 448 S.W.3d 441, 446 (Tex. Crim. App. 2014). In *Miranda*, the Supreme Court created safeguards to protect the privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at

75 (citing *Miranda v. Arizona*, 384 U.S. 436, 441 (1966)). In keeping with those safeguards, police officers must give *Miranda* warnings to a person who is in custody before questioning him. *Id.* "Only if the person voluntarily and intelligently waives his *Miranda* rights, including the right to have an attorney present during questioning, may his statement be introduced into evidence against him at trial." *Id.*

The evidence at trial reflects that Seals voluntarily appeared at the police station after the incident because he wanted to tell the police what happened. The trial court observed that "[t]he defendant went himself in person and volunteered this information[.]" Additionally, the record reflects that Seals was informed of his *Miranda* rights before Seals made his written statement, which also occurred prior to the video reenactment. We conclude that the trial court did not err in overruling Seals's objections and admitting the first written statement and the video reenactment. As to Seals's written statement concerning the May incident, the record shows no Fifth Amendment objection by the defense; consequently, Seals failed to preserve error, if any, under the Fifth Amendment relating to the second written statement. We overrule Seals's Fifth Amendment challenges.

Next, we address Seals's *Crawford* argument. "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused

43

shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford*, 541 U.S. at 42 (quoting U.S. Const. amend. VI). The United States Supreme Court has applied this rule to "testimonial" statements and held that such statements are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015) (citing *Crawford*, 541 U.S. at 54).

Admission of hearsay evidence against a criminal defendant may implicate the confrontation clause because the defendant may not be afforded an opportunity to confront the out-of-court declarant. *Simpson v. State*, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003); *Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) (citing *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980)). Here, the out-of-court declarant was Seals himself, and Seals testified at trial. Because the complained-of evidence is a statement by Seals himself, the Sixth Amendment right to confront witnesses under *Crawford* is not implicated. Furthermore, Appellant did not make a *Crawford* objection to the complained-of evidence at trial. *See Crawford*, 541 U.S. at 61-69. By failing to make an objection at trial on confrontation clause grounds, Appellant has not preserved this argument for review. *See* Tex. R. App. P. 33.1(a); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that

44

objection at trial is required to preserve error on confrontation clause grounds). We overrule Seals's *Crawford* challenge on appeal.

Finally, Seals argues that the two written statements and the video reenactment were inadmissible hearsay to which no exception applied. At trial, the defense made a hearsay objection to the admission of the written statement Seals gave the day of the shooting. The defense also made a hearsay objection to the admission of the written statement Seals gave concerning the May incident. The trial court overruled the hearsay objections to the written statements without elaboration. However, at the trial the defense did not make a hearsay objection to the admission of the reenactment video. Because the defense did not make a hearsay objection to the reenactment video at trial, it failed to preserve error on this issue as to the reenactment video. *See, e.g.*, *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("Preservation of error is a systemic requirement on appeal."); *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009) (same) (citing Tex. R. App. P. 33.1). We need not address the merits of an issue that has not been preserved for appeal. *Wilson v. State*, 311 S.W.3d 452, 473-74 (Tex. Crim. App. 2010) (citing *Ford*, 305 S.W.3d at 532).

Under our Rules of Evidence, a statement is not hearsay if the statement is offered against a party and is his own statement. Tex. R. Evid. 801(e)(2)(A);

*Saavedra v. State*, 297 S.W.3d 342, 344 n.2 (Tex. Crim. App. 2009) (statement is not hearsay if it is a party's own statement and is offered against him). An admission of a party opponent under Rule 801(e)(2)(A) is admissible when the statement is the opponent's own statement that is offered against him. *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999). This rule recognizes that the out-of-court statements of a party differ from the out-of-court statements of non-parties, and a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements. *Id.*

Even if a statement is hearsay, an exception to the rule against hearsay also allows the admission of statements made against the declarant's interest. Tex. R. Evid. 803(24); *Coleman v. State*, 428 S.W.3d 151, 158 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The State offered the two written statements given by Seals and the video reenactment as evidence against Seals. We conclude that the trial court could have reasonably concluded that the statements and video reenactment were admissible as non-hearsay admissions by a party opponent. *See Saavedra*, 297 S.W.3d at 344 n.2. Alternatively, the trial court could have reasonably concluded that, to the extent the complained-of items contained hearsay, the evidence was admissible under the statement against interest exception to the hearsay rule. Tex. R. Evid. 803(24); *see Coleman*, 428 S.W.3d at 158-59.

46

Therefore, we conclude that the trial judge did not err in admitting the complained-of-items into evidence. *Shavers v. State*, 985 S.W.2d 284, 290 (Tex. App.—Beaumont 1999, pet. ref'd). We overrule Seals's sixth issue.

EVIDENCE OF PRIOR CONVICTION

In his final issue, Seals argues that the evidence of his previous conviction was insufficient and that the trial court erred in admitting such evidence with respect to the enhancement allegations. In particular, Seals objects to the admission of the documents admitted as State's Exhibit 2, which, he argues, "do not [] contain any identifiable information, such as photographs or a physical description, that could be used to link Appellant to the [prior] judgment."

To establish that a defendant has been convicted of a prior offense when a criminal defendant pleads "not true" to an enhancement allegation, the State must prove beyond a reasonable doubt that: (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *See Wood v. State*, 486 S.W.3d 583, 589-90 (Tex. Crim. App. 2016) (citing *Flowers v. State,* 220 S.W.3d 919, 923 (Tex. Crim. App. 2007). No specific document or mode of proof is required. *See id.* at 588. The State may introduce documents, admissions or stipulations, or testimonial evidence sufficient to prove that the defendant was convicted of the enhancement allegation. *Id.* (citing *Flowers*, 220 S.W.3d at 921-22; Chapter 12 of the Texas Penal Code;

47

and Tex. Code Crim. Proc. Ann. art. 37.07). The trier of fact looks at the totality of the evidence to determine whether a previous conviction exists and whether the defendant was the person convicted. *Flowers*, 220 S.W.3d at 923.

In this case, the indictment alleged that Seals had previously been convicted for possession of a controlled substance in 1994. During the punishment phase, Seals pleaded "[n]ot true" to this enhancement. The State offered Exhibit 2 into evidence, and the defense objected that the documents therein were "hearsay and inappropriate evidence to support the judgment or to support a prior enhancement[,]" especially that the judgment was invalid for failure to have the defendant's fingerprint. The trial court overruled the defense objections and admitted the exhibit.

State's Exhibit 2 includes the following: a certified 1994 judgment against Erich Stockley Seals for possession of a controlled substance; a 1994 Agreed Punishment Recommendation for Erich Seals as to the offense of possession of a controlled substance, signed by Erich S. Seals; a blank Unagreed Punishment Recommendations form, signed by Erich S. Seals; a certified 1994 Written Plea Admonishments for Seals as to the offense of possession of a controlled substance, signed by Erich S. Seals; a certified 1994 indictment against Seals for possession

of a controlled substance; and a certified 1994 criminal docket sheet for Cause Number 67226 against Erich Stockley Seals, including fingerprints.

Under Rule of Evidence 803(22)(B), evidence of a final judgment of conviction is admissible in a criminal case as an exception to the rule against hearsay if:

> (i) the judgment was entered after a trial or a guilty or nolo contendere plea;
> (ii) the conviction was for a criminal offense;
> (iii) the evidence is admitted to prove any fact essential to the judgment;
> (iv) when offered by the prosecutor for a purpose other than impeachment, the judgment was against the defendant; and
> (v) an appeal of the conviction is not pending.

Tex. R. Evid. 803(22)(B). The record reflects that the 1994 judgment against Seals was for the criminal offense of possession of a controlled substance to which Seals pleaded "Guilty[.]" The State offered the judgment to support the enhancement allegation, and the record reflects that no appeal of such conviction was pending. Accordingly, we conclude that the trial court did not err in overruling Seals's hearsay objection.

Seals also complains that the State "chose not to call any witnesses who had personal knowledge that Appellant was the same defendant named in State's Exhibit 2, and Appellant provided no testimony that would link him to the judgment." We disagree.

49

Deborah Beavers (Beavers), an investigator for the district attorney's office, testified for the State. Beavers testified that she took Seals's fingerprints, and State's Exhibit 1, a fingerprint card of Seals's right thumbprint, was admitted into evidence. Beavers also testified that she compared the print she took to the fingerprint contained in State's Exhibit 2, and that, in her professional opinion, the fingerprints in State's Exhibit 2 are the same as the fingerprint of Seals in State's Exhibit 1. Also, during the guilt/innocence phase of trial, Seals testified that he had been convicted for a drug case in 1993 or 1994.

Certified copies of Seals's prior conviction were admitted into evidence. Investigator Beavers testified that the fingerprints of Seals that she took matched the fingerprint in State's Exhibit 2. Seals also testified that he had a previous conviction for a drug charge. Under the totality of the circumstances and considering the documents and testimonial evidence, the trial court did not err in concluding that the evidence was sufficient to prove that Seals was convicted of the enhancement allegation. *See Wood*, 486 S.W.3d at 590; *Flowers*, 220 S.W.3d at 921-22. We overrule Seals's seventh issue.

Having overruled all issues raised by Seals, we affirm the judgment of the trial court.

AFFIRMED.

50

_____
LEANNE JOHNSON
Justice

Submitted on April 18, 2016
Opinion Delivered August 10, 2016
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.